FILED
United States Court of Appeals
Tenth Circuit

July 2, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KEVIN RAY UNDERWOOD,

     Petitioner - Appellant,

v.

No. 16-6262

TERRY ROYAL, Warden, Oklahoma
State Penitentiary,

     Respondent - Appellee.
_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:12-CV-00111-D)**
_____

Sarah M. Jernigan, Assistant Federal Public Defender (Patti Palmer Ghezzi, Assistant
Federal Public Defender, Western District of Oklahoma, with her on the briefs),
Oklahoma City, Oklahoma, for Petitioner-Appellant.

Jennifer J. Dickson, Assistant Attorney General (Mike Hunter, Attorney General of
Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.
_____

Before **MATHESON**, **KELLY**, and **BACHARACH**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

     Kevin Ray Underwood appeals from the federal district court's denial of his

petition for writ of habeas corpus under 28 U.S.C. § 2254. In 2008, a jury convicted Mr.

Underwood of first degree murder and sentenced him to death in Oklahoma state court.

The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Mr. Underwood's

conviction and sentence and later denied post-conviction relief.

Mr. Underwood sought federal habeas relief from his death sentence under § 2254.

The federal district court denied Mr. Underwood's requests for relief and for a certificate

of appealability ("COA") on all eleven grounds raised in the § 2254 application. We

granted COAs on six of the eleven grounds for relief.

Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm the district

court's denial of habeas relief on all six grounds.

## I. **BACKGROUND**

We begin with the relevant factual history as presented by the OCCA.[1] We then

provide an overview of the procedural history leading to this appeal. We present

additional background below as relevant to our discussion of Mr. Underwood's claims.

### A. *Factual History*

The OCCA, in addressing Mr. Underwood's direct appeal, set forth the following

relevant facts:

> [Mr. Underwood] was charged with murdering ten-year-old
> [J.B.] on April 12, 2006, in Purcell, Oklahoma. [Mr.
> Underwood] lived alone in the same apartment complex
> where [J.B.] lived with her father, Curtis Bolin. Due to her
> father's work schedule, [J.B.] was typically home alone for a

---

[1] *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *see also Al-Yousif v. Trani*, 779 F.3d 1173, 1181 (10th Cir. 2015) ("The presumption of correctness also applies to factual findings made by a state court of review based on the trial record." (quotations omitted)).

period of time after school.  On the day in question, [J.B.] played in the school library with a friend for a short time before going home.  She was never seen alive again.

Police, firefighters, and a host of citizen volunteers began a search for [J.B.].  The day after [J.B.]'s disappearance, the Federal Bureau of Investigation [the "FBI"] added over two dozen people to the effort.  On April 14, 2006, two days after [J.B.] was last seen, police set up several roadblocks around the apartment complex where she lived, seeking leads from local motorists.  Around 3:45 p.m. that day, FBI Agent Craig Overby encountered a truck driven by [Mr. Underwood]'s father at one of the roadblocks; [Mr. Underwood] was a passenger in the truck.  [Mr. Underwood]'s father told Overby that they had heard about the disappearance, and that in fact, [Mr. Underwood] was the girl's neighbor.  From speaking with other neighbors at the apartment complex, Overby knew that a young man living there may have been the last person to see [J.B.].  Overby asked if [Mr. Underwood] would come to the patrol car to talk for a moment, and [Mr. Underwood] agreed, while his father waited in the truck.  In the patrol car, [Mr. Underwood] made statements that piqued Overby's interest.[]  Overby asked [Mr. Underwood] if he would come to the police station for additional questioning.  Again, [Mr. Underwood] agreed, and Overby assured [Mr. Underwood]'s father that he (Overby) would give [Mr. Underwood] a ride home.

At the police station, [Mr. Underwood] was interviewed by Agent Overby and Agent Martin Maag.  [Mr. Underwood] told them about seeing [J.B.] on April 12, and discussed his activities on that day and other matters.  At the conclusion of this interview, which lasted less than an hour, the agents asked [Mr. Underwood] if they could search his apartment.  [Mr. Underwood] agreed.  The agents accompanied [Mr. Underwood] to his apartment around 5:00 p.m.  While looking around the apartment, Overby saw a large plastic storage tub in [Mr. Underwood]'s closet; its lid was sealed with duct tape.  [Mr. Underwood] saw Overby looking at the tub, and volunteered that he kept comic books in it; he said that he had taped the lid to keep moisture out.  Overby asked if he could look inside the tub, and [Mr. Underwood] agreed.  When Overby pulled back a portion of the tape and lifted a

3

corner of the lid, he saw a girl's shirt—and realized that it matched [Mr. Underwood]'s description of the shirt [J.B.] was wearing on the day she disappeared.[] When Overby commented that he saw no comic books in the tub, [Mr. Underwood] interjected, "Go ahead and arrest me." Overby immediately responded, "Where is she?" [Mr. Underwood] replied, "She's in there. I hit her and chopped her up." [Mr. Underwood] then became visibly upset, began hyperventilating, and exclaimed, "I'm going to burn in Hell." He was placed under arrest and escorted out to the agents' vehicle. Agent Overby summoned local authorities to secure the scene.

Back at the police station, [Mr. Underwood] was advised of his right to remain silent, and his right to the assistance of counsel during any questioning, consistent with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because he asked for a lawyer, the interview was concluded. About fifteen minutes later (approximately 5:45 p.m.), police approached [Mr. Underwood] and asked if he would reaffirm, in writing, his original verbal consent to a search of his apartment. [Mr. Underwood] agreed, and spent the next few hours sitting in a police lieutenant's office. He conversed with various officers who were sent to guard him, and made some incriminating statements during that time.

Around 9:30 p.m. that evening, [Mr. Underwood] asked to speak with the two FBI agents he had initially talked to (Overby and Maag). Because [Mr. Underwood] had previously asked for counsel, [Oklahoma State Bureau of Investigation ("OSBI")] Agent Lydia Williams visited with him to determine his intentions. Agent Williams reminded [Mr. Underwood] that he had earlier declined to be questioned, and explained that because of that decision, police could not question him any further. [Mr. Underwood] emphatically replied that he wanted to talk to the agents. Around 10:15 p.m., Agents Overby and Maag interviewed [Mr. Underwood] at the police station. Before questioning began, Overby reminded [Mr. Underwood] of his *Miranda* rights, and [Mr. Underwood] signed a written form acknowledging that he understood them and waived them. When asked if anyone had offered him anything in exchange for agreeing to talk, [Mr. Underwood] replied that one of the

4

officers had predicted things would go better for him if he cooperated. Besides acknowledging his waiver of *Miranda* rights, [Mr. Underwood] also signed another written consent to a search of his apartment. A video recording and transcript of the interview that followed, which lasted about an hour, was presented to the jury at trial and is included in the record on appeal.

In the interview, [Mr. Underwood] describes how he had recently developed a desire to abduct a person, sexually molest them, eat their flesh, and dispose of their remains. He explains in considerable detail how he attempted to carry out this plan on [J.B.], whom he had decided was a convenient victim. [Mr. Underwood] stated that he invited [J.B.] into his apartment to play with his pet rat. Once [J.B.] was inside, [Mr. Underwood] hit her on the back of the head several times with a wooden cutting board; she screamed in pain and begged him to stop. [Mr. Underwood] proceeded to suffocate the girl by sitting on her and placing his hand across her face. [Mr. Underwood] told the agents that this was not an easy task, and that fifteen to twenty minutes passed before she succumbed. [Mr. Underwood] claimed he then attempted to have sexual relations with the girl's body, but was unable to perform. He then moved her body to the bathtub and attempted to decapitate it with a knife, but was unsuccessful at that task as well. Frustrated, [Mr. Underwood] wrapped [J.B.]'s body in plastic sheeting and placed it in a large plastic container which he hid in his closet. [Mr. Underwood] also dismantled [J.B.]'s bicycle and hid it inside his apartment, to make it look as if she had left the apartment complex.

[J.B.]'s remains were taken to the Medical Examiner's office for an autopsy. The Medical Examiner noted bruises to the back of the girl's head, consistent with [Mr. Underwood]'s claim that he hit her forcefully with a cutting board. The examiner also noted petechia in the girl's eyes, and curved marks on her face, consistent with [Mr. Underwood]'s description of how he had suffocated her. The most pronounced wound on the body was a very deep incision to [J.B.]'s neck, which was also consistent with the injuries [Mr. Underwood] admitted to inflicting. The Medical Examiner also noted trauma to the girl's genital area, including tearing of the hymen. However, the Medical Examiner could not say

5

that [J.B.] was alive, or even conscious, when her neck was cut or when she was sexually assaulted. The official cause of death was declared to be asphyxiation.

*Underwood v. State*, 252 P.3d 221, 230-31 (Okla. Crim. App. 2011) (footnotes omitted).

## B. *Procedural History*

The following proceedings preceded Mr. Underwood's present appeal: (1) jury trial in Oklahoma state court, (2) direct appeal and application for state post-conviction relief in the OCCA, and (3) application for federal post-conviction relief in the United States District Court for the Western District of Oklahoma under § 2254. We provide a brief overview of each proceeding.

## 1. **Trial**

In 2008, an Oklahoma jury convicted Mr. Underwood of first degree murder, under Section 701.7(A) of Title 21 of the Oklahoma Statutes, and sentenced him to death.

In the guilt stage, the jury found the evidence sufficient to establish that Mr. Underwood murdered J.B. *Underwood*, 252 P.3d at 229. Although Mr. Underwood "did not formally concede his guilt . . . , but instead required the State to present its evidence on that issue, neither did he seriously contest the guilt-stage evidence against him." *Id.* at 232. "In fact, defense counsel told the jury in guilt-stage opening statements that it would probably find [Mr. Underwood] guilty, but that there would be reasons to spare his life." *Id.* The guilt evidence presented to the jury included a video recording and printed transcript of Mr. Underwood's interview with the FBI agents, during which he had confessed to the murder. *Id.* at 238.

6

In the punishment stage, the same jury found one aggravating circumstance and recommended the death penalty after weighing it against any mitigating circumstances established at trial. *Id.* at 229-30, 246. In its aggravation case, the State put evidence of two aggravating circumstances before the jury: (1) the murder was especially heinous, atrocious, or cruel (the "HAC" aggravator); and (2) Mr. Underwood posed a continuing threat to society (the "continuing threat" aggravator). *Id.* at 230 n.1. The jury found the existence of the HAC aggravator but not the continuing threat aggravator. *Id.* at 232. In his mitigation case, Mr. Underwood presented "extensive evidence . . . , including the testimony of family, friends, and three experts who had evaluated [his] mental health." *Id.* The jury recommended the death sentence, which the trial court imposed. *Id.* at 230.

## 2. **Direct Appeal and Application for State Post-Conviction Relief**

Mr. Underwood appealed to the OCCA, raising a variety of trial errors, including the six grounds for relief before us in this appeal. In 2011, the OCCA affirmed Mr. Underwood's conviction and sentence. *Id.* at 258.[2] The court also performed a statutorily mandated sentencing review and concluded that "the evidence was sufficient to support the one aggravating circumstance found by the jury" and that no "improper factor" influenced the jury's imposition of the death sentence. *Id.* Mr. Underwood then applied for post-conviction relief, which the OCCA denied in an unpublished summary opinion in 2012.

---

[2] The Supreme Court denied Mr. Underwood's petition for writ of certiorari. *Underwood v. Oklahoma*, 565 U.S. 1121 (2012).

7

3. **Application for Federal Post-Conviction Relief under § 2254**

In 2013, Mr. Underwood filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma. The petition presented eleven grounds for relief, including the six before us in this appeal. The district court denied relief on all eleven grounds. *See Underwood v. Duckworth*, 2016 WL 4059162 (W.D. Okla. July 28, 2016). It also denied a COA on all grounds. *See Underwood v. Duckworth*, 2016 WL 4120772 (W.D. Okla. July 28, 2016).

Mr. Underwood appealed, and this court granted COAs on six of Mr. Underwood's grounds for relief, which we address below.

## II. **DISCUSSION**

We begin with our standard of review. We then analyze the six grounds for relief on which we have granted COA: (1) ineffective assistance of trial counsel, (2) prosecutorial misconduct, (3) improper jury instruction and prosecutor statements on mitigating evidence, (4) admission of unconstitutional victim impact testimony, (5) imposition of the death penalty without a jury finding that the HAC aggravator outweighed any mitigating circumstances beyond a reasonable doubt, and (6) cumulative error. We conclude that Mr. Underwood is not entitled to relief on any of these grounds. Throughout our discussion, we provide additional background information as needed.

8

A. *Standard of Review*

"Our review is . . . governed by the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), which requires federal courts to give significant deference to state court decisions." *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir. 2013).[3]

Under AEDPA, when a state court has decided a claim on the merits, we must defer to the court's adjudication of the claim unless it:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[4]

Section 2254(d)(1)'s "contrary to" and "unreasonable application of" language denotes two distinct inquiries. "An OCCA decision is 'contrary to' a clearly established law if it applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially

---

[3] "AEDPA concerns federal court deference to the decisions of state courts. Our review of the federal district court's application of AEDPA is de novo." *Murphy v. Royal*, 875 F.3d 896, 913 n.20 (10th Cir. 2017), *cert. granted*, No. 17-1107, 2018 WL 747674 (U.S. May 21, 2018).

[4] AEDPA additionally provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In addressing Mr. Underwood's challenges to the OCCA's factual determinations in our discussion below, we apply the § 2254(d)(2) standard, but his arguments would likewise fail under § 2254(e)(1).

9

indistinguishable facts." *Lockett*, 711 F.3d at 1231 (alterations and quotations omitted); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "An OCCA decision is an 'unreasonable application' of clearly established federal law if it identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of petitioner's case." *Lockett*, 711 F.3d at 1231 (quotations omitted); *see also Bell*, 535 U.S. at 694.

"If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, . . . § 2254(d) . . . do[es] not apply . . . , [and] we review the [federal] district court's legal conclusions de novo and its factual findings, if any, for clear error." *Cole v. Trammell*, 755 F.3d 1142, 1148 (10th Cir. 2014).

B. *The Six Issues on Appeal*

Having presented our standard of review, we now address each of the six grounds for relief on which we have granted COA: (1) ineffective assistance of trial counsel, (2) prosecutorial misconduct, (3) improper jury instruction and prosecutor statements on mitigating evidence, (4) admission of unconstitutional victim impact testimony, (5) imposition of the death penalty without a jury finding that the HAC aggravator outweighed any mitigating circumstances beyond a reasonable doubt, and (6) cumulative error.

1. **Ineffective Assistance of Counsel**

Mr. Underwood contends that he is entitled to relief from his death sentence based on his trial counsel's failure to present expert rebuttal testimony relating to the timing of J.B.'s death. The OCCA rejected this claim on the merits. *Underwood*, 252 P.3d at 252.

In addressing this claim, we begin with the relevant legal background and additional factual and procedural background. We then examine the OCCA's merits decision under § 2254(d) and conclude that it was not contrary to—or an unreasonable application of—Supreme Court law or based on an unreasonable determination of the facts. We therefore affirm the district court's denial of habeas relief on Mr. Underwood's ineffective assistance claim.[5]

a. *Legal background*

We first discuss the general framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to address ineffective assistance claims. We then focus on the deficient performance part of the test, which guides our analysis below.

i. Overview

"The Supreme Court has held that the Sixth Amendment right to counsel includes a right to effective representation." *Frost v. Pryor*, 749 F.3d 1212, 1224 (10th Cir. 2014); *see also Strickland*, 466 U.S. at 686. Counsel can "deprive a defendant of the right to effective assistance . . . by failing to render adequate legal assistance." *Strickland*, 466

---

[5] Mr. Underwood also sought—and was denied—an evidentiary hearing on the ineffective assistance claim in both the OCCA and federal district court. *See Underwood*, 252 P.3d at 250; *Underwood*, 2016 WL 4059162, at *33. Mr. Underwood asserts on appeal that "the district court's denial of an evidentiary hearing [on the ineffective assistance claim] was error." Aplt. Br. at 25. We decline to address this issue because it is inadequately briefed. *See Leathers v. Leathers*, 856 F.3d 729, 751 (10th Cir. 2017).

In any event, the Supreme Court has held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). As discussed above, Mr. Underwood cannot overcome § 2254(d)(1) on the record that was before the OCCA with respect to his ineffective assistance claim. Accordingly, the "district court [was] not required to hold an evidentiary hearing." *Id.* at 183 (quotations omitted).

U.S. at 686 (quotations omitted).  To establish a violation under *Strickland*, a habeas petitioner must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense."  *Id.* at 687.  Because we rely only on deficient performance to resolve this case, we restrict our discussion accordingly.  *See Hooks v. Workman*, 689 F.3d 1148, 1186 (10th Cir. 2012) ("These two prongs may be addressed in any order, and failure to satisfy either is dispositive.").

ii. Deficient performance

To establish constitutionally deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (quotations omitted).  In other words, counsel's performance "must have been completely unreasonable, not merely wrong."  *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999).  "Every effort must be made to evaluate the conduct from counsel's perspective at the time."  *Littlejohn v. Trammell*, 704 F.3d 817, 859 (10th Cir. 2013) (quotations omitted).  "However, while we entertain a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, we nevertheless apply closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case."  *Id.* (citations and quotations omitted).

b. *Relevant facts*

In his interview with the FBI agents, Mr. Underwood described J.B.'s murder.  He told them he had "hit [J.B.] on the back of the head several times with a wooden cutting

12

board" and that she had "screamed in pain and begged him to stop." *Underwood*, 252

P.3d at 231.  He stated that he had "suffocate[d] [J.B.] by sitting on her and placing his

hand across her face" and that "fifteen to twenty minutes passed before she succumbed."

*Id.*  He "claimed he then attempted to have sexual relations with the girl's body, but was

unable to perform[,] . . . and attempted to decapitate it with a knife, but was unsuccessful

at that task as well." *Id.*

During the guilt stage of Mr. Underwood's trial, Dr. Inas Yacoub, the Medical

Examiner, testified for the State regarding the possibility that J.B. had survived Mr.

Underwood's attempt to suffocate her and was still alive or even conscious when he then

attempted to sexually assault and decapitate her.  Dr. Yacoub had previously performed

J.B.'s autopsy and determined that J.B. died from "asphyxiation." *Id.* at 231, 251.  At

trial, Dr. Yacoub testified that the injuries observed in J.B.'s genital area and on her neck

may have occurred while she was still alive and even conscious.  Trial Tr. Vol. VII at

1174-78, 1817-19.  On cross-examination, trial counsel for Mr. Underwood elicited Dr.

Yacoub's acknowledgement that she could not determine with scientific certainty at what

point J.B. lost consciousness. *Id.* at 1817-19.

In the punishment stage of Mr. Underwood's trial, the State "incorporated the

testimony from the guilt stage to show that the murder was especially, heinous, atrocious,

or cruel." *Underwood*, 252 P.3d at 232.[6]  In closing argument, the State referenced Dr.

_____

[6] Under Oklahoma law, the HAC aggravator is one of several aggravating
circumstances that, if found beyond a reasonable doubt, enables the imposition of the
death penalty.  Okla. Stat. tit. 21, §§ 701.11, 701.12.  The HAC aggravator showing

13

Yacoub's testimony to support its theory that J.B. experienced conscious physical suffering before her death: "And the medical examiner told you there was probably— there's a possibility that there was more that preceded her last breath. And when she talks about the injuries to her vagina, and she talks about the injuries to her throat . . . . There's a lot of stuff that preceded her last breath." Trial Tr. Vol. X at 2553-54.

Before trial, Mr. Underwood's trial counsel "had retained [a] forensic pathologist, Dr. John Adams, to review the autopsy findings." *Underwood*, 252 P.3d at 251. But trial counsel never called Dr. Adams to testify. *Id.*

c. *OCCA and federal district court decisions*

In his appeal to the OCCA, Mr. Underwood argued that trial counsel's failure to call Dr. Adams to rebut Ms. Yacoub's testimony constituted reversible error. *Id.* at 250. He submitted a sworn affidavit, secured by appellate counsel, in which Dr. Adams stated his expert opinion that J.B. could not have been alive during the attempted decapitation. Defendant's Appeal Exhibit A. Dr. Adams based his conclusion in part on his observation that the crime scene photographs showed very little blood spatter, whereas "widespread[] [blood spatter] would support a theory of antemortem injury." *Id.* at 3-4. The OCCA denied Mr. Underwood's ineffective assistance claim on the merits, "discern[ing] sound strategic reasons for the defense team not calling its forensic pathologist, and . . . find[ing] no prejudice flowing from that decision." *Underwood*, 252

---

requires "evidence of *conscious physical suffering of the victim prior to death*." *Cheney v. State*, 909 P.2d 74, 80 (Okla. Crim. App. 1995) (emphasis added) (quotations omitted).

P.3d at 253. Mr. Underwood then sought federal habeas relief, which the district court denied. *Underwood*, 2016 WL 4059162, at \*13.

    d. *Analysis*

We review the OCCA's decision under §§ 2254(d)(1) and (d)(2) and conclude that it was not contrary to—or an unreasonable application of—clearly established Supreme Court law or based on an unreasonable determination of the facts. Although the OCCA addressed both deficient performance and prejudice in its *Strickland* analysis, our analysis begins and ends with the former ground, which alone provides a sufficient basis for denying relief. *See Hooks*, 689 F.3d at 1186 ("[F]ailure to satisfy either [*Strickland* prong] is dispositive.").

    i.   Section 2254(d)(1): Reasonableness of legal determinations

The OCCA's conclusion that Dr. Adams's affidavit did not overcome the presumption of sound trial strategy was consistent with and a reasonable application of *Strickland*. In determining whether counsel's performance was deficient, "[e]very effort must be made to evaluate the conduct from counsel's perspective at the time." *Littlejohn*, 704 F.3d at 859 (quotations omitted). Here, the OCCA reasonably evaluated the value of Dr. Adams's rebuttal testimony from trial counsel's perspective and determined it "might have done more harm than good." *Underwood*, 252 P.3d at 252.

As the OCCA reasoned, Dr. Adams's testimony would have had no relevance in the guilt stage and, in the punishment stage, could have drawn the jury's attention away from Mr. Underwood's affirmative mitigation case and back to the "gruesome" details of the crime. *Id.* For example, Dr. Adams based his conclusion that J.B. was already

15

deceased at the time of the attempted decapitation in part on the absence of widespread blood spatter, as captured in the crime scene photographs. He also noted that "a massive exsanguination," or loss of blood, would support the possibility that J.B. was alive during the attempted decapitation. Defendant's Appeal Exhibit A at 3-4. But in his confession, Mr. Underwood had stated that, when he started cutting J.B.'s neck, "[he] couldn't believe the amount of blood that came out." State's Trial Exhibit 162 at 69. Had Dr. Adams testified, the prosecution likely would have questioned him on cross-examination about this statement. This line of questioning could potentially have discredited Dr. Adams's conclusions and "would arguably have distracted the jury in a way unfavorable to the defense." *Underwood*, 252 P.3d at 252.

We acknowledge Mr. Underwood's concern about the emotional impact of Dr. Yacoub's unrebutted testimony on the jury, and we may even disagree with trial counsel's challenged course of action here. But under AEDPA's deferential standard, we cannot conclude that the OCCA unreasonably applied *Strickland* in determining that trial counsel's strategy was at least reasonable.

ii. Section 2254(d)(2): Reasonableness of factual determinations

Mr. Underwood contends that the OCCA based its conclusion—that Dr. Adams's affidavit failed to overcome the presumption of sound trial strategy—on unreasonable factual determinations under § 2254(d)(2) because it "completely disregarded [Dr.] Yacoub's key prejudicial testimony" and "ignored Dr. Adams's conclusive condemnation

16

of [her] alternate theories." Aplt. Br. at 24.[7] We need not decide whether § 2254(d)(2), rather than § 2254(d)(1), supplies the appropriate standard of review.[8] Under either standard, Mr. Underwood's argument fails for the same reason—the OCCA did *not* disregard Dr. Yacoub's testimony. Rather, the OCCA observed that her testimony was "inconclusive" and reasoned that it arguably related to "a collateral matter." *Underwood*, 252 P.3d at 252. Likewise, the OCCA did not disregard the testimony Dr. Adams was prepared to offer. Instead, the OCCA reasonably determined, as discussed above, that Dr. Adams's testimony "might have done more harm than good." *Id.*

2. **Prosecutorial Misconduct—Arguing Facts Not in Evidence**

Mr. Underwood contends that he is entitled to relief from his death sentence based on the State's closing argument in both stages of the trial that the evidence established he had shaved J.B.'s pubic region with a razor. The OCCA rejected this claim on the merits. *Underwood*, 252 P.3d at 249.

In addressing this claim, we begin with the relevant legal background and additional factual and procedural background. We assume without deciding that the OCCA's decision was based on an unreasonable determination of the facts under

---

[7] This specific argument does not appear in Mr. Underwood's § 2254 petition. In any event, as we explain below, it lacks merit.

[8] We have previously said: "It is clear that, where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable [under § 2254(d)(2)]." *Byrd v. Workman*, 645 F.3d 1159, 1171–72 (10th Cir. 2011) (quotations omitted). But Mr. Underwood argues that the OCCA disregarded—as opposed to misapprehended or misstated—Dr. Yacoub's testimony and Dr. Adams's affidavit.

§2254(d)(2). We therefore review the issue de novo and conclude that Mr. Underwood is not entitled to relief because he has not shown the alleged error violated his due process. We affirm the district court's denial of habeas relief on Mr. Underwood's prosecutorial misconduct claim.

a. *Legal background*

We first provide a general overview of prosecutorial misconduct standards and the framework under *Donnelly v. DeChristoforo*, 416 U.S. 645 (1974), for determining when prosecutorial misconduct warrants reversal of state court convictions and sentences. We then focus on case law regarding prosecutorial argument of facts not in evidence, the type of misconduct alleged here.

i. Overview

The Supreme Court has "counselled prosecutors 'to refrain from improper methods calculated to produce a wrongful conviction [or sentence].'" *United States v. Young*, 470 U.S. 1, 7 (1985) (alterations omitted) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *see Le v. Mullin*, 311 F.3d 1002, 1018 (10th Cir. 2002). Although "the adversary system permits the prosecutor to . . . 'strike hard blows, he is not at liberty to strike foul ones.'" *Id.* (quoting *Berger*, 295 U.S. at 88).

Prosecutorial misconduct does not necessarily result in constitutional error warranting habeas relief. "Generally, there are two ways in which prosecutorial misconduct . . . can result in constitutional error." *Littlejohn*, 704 F.3d at 837. "First, it can prejudice a specific right as to amount to a denial of that right." *Id.* (alterations and quotations omitted). "Additionally, absent infringement of a specific constitutional right,

18

a prosecutor's misconduct may in some instances render a habeas petitioner's trial 'so fundamentally unfair as to deny him due process.'" *Id.* (quoting *Donnelly*, 416 U.S. at 645). "This determination may be made only after considering all of the surrounding circumstances, including the strength of the state's case." *Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005). The fundamental unfairness test applies to instances of prosecutorial misconduct occurring in either the guilt or sentencing stage of trial. *Smallwood v. Gibson*, 191 F.3d 1257, 1275-76 (10th Cir. 1999).

ii. Arguing facts not in evidence

Although "[a] prosecutor may comment on and draw reasonable inferences from evidence presented at trial," *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005), arguing "prejudicial facts not in evidence" is one type of prosecutorial misconduct. *See Berger*, 295 U.S. at 84. As with other types of prosecutorial misconduct, "[t]he line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *Young*, 470 U.S. at 7.

b. *Relevant facts*

In closing argument in both stages of Mr. Underwood's trial, the State interpreted the evidence as showing that Mr. Underwood had shaved J.B.'s pubic region with a razor. Trial Tr. Vol. VII at 1853-54 (guilt stage); Trial Tr. Vol. X at 2522, 2554 (punishment stage). The evidence included a photograph of Mr. Underwood's home, taken by law enforcement, depicting a blue object on a desk. State's Trial Exhibit 90. The evidence also included the testimony of Jolene Russell, an OSBI criminalist. Ms. Russell, after identifying the blue object in the photograph as an "electric razor," had recalled the

following observations "about [J.B.]'s vaginal area at the morgue when the body [was] being processed":  (1) "loose hairs around the pubic region," (2) "[attached] pubic hair in the vaginal area," and (3) what appeared to be a "clean" area above the vaginal area. Trial Tr. Vol. VI at 1522.  Finally, the evidence included the testimony of Dr. Yacoub, who recalled removing "a hair from the pubic area" during J.B.'s autopsy but did not otherwise comment on the presence or absence of hair in that area.  Trial Tr. Vol. VII at 1760.

    c.  *OCCA and federal district court decisions*

In his appeal to the OCCA, Mr. Underwood argued that the prosecution's remarks constituted reversible error.  *Underwood*, 252 P.3d at 249.[9]  The OCCA denied Mr. Underwood's prosecutorial misconduct claim on the merits, determining that the prosecution's remarks (1) were not improper, because they were "reasonably based on the evidence," and (2) "while [they] may have, to some degree, underscored the vile nature of the entire crime, [they] did not unfairly overshadow the other depraved things [Mr. Underwood] freely admitted to doing."  *Id.*  In its discussion of this claim, the OCCA stated that "[Ms.] Russell noticed that the girl's pubic area appeared partially shaven."  *Id.*  Mr. Underwood then sought federal habeas relief, arguing the OCCA had misstated the evidence, and the district court denied relief.  *Underwood*, 2016 WL 4059162, at *23.

---

[9] Because the State allocated different portions of the closing arguments to two different prosecutors, we designate them jointly as "the prosecution."

20

d. *Analysis*

As previously explained, we review the Mr. Underwood's prosecutorial misconduct claim de novo and conclude that he is not entitled to habeas because he has not shown the alleged error violated his due process under *Donnelly*.[10] Mr. Underwood contends that the OCCA "blatant[ly] misstate[d]" the evidence "when it said '[Ms.] Russell noticed that the girl's pubic area appeared partially shaven.'" Aplt. Br. at 40 (quoting *Underwood*, 252 P.3d at 249). We need not decide whether Mr. Underwood's argument overcomes AEDPA deference. Even assuming we must review the prosecutorial misconduct claim de novo, he is not entitled to habeas relief. Based on our independent review of the record, we agree with the OCCA's determination that the alleged prosecutorial misconduct—the remarks about shaving—"did not unfairly overshadow the other depraved things [Mr. Underwood] freely admitted to doing" in his confession. *Underwood*, 252 P.3d at 249. The remarks therefore did not render his trial "so fundamentally unfair as to deny him due process." *Donnelly*, 416 U.S. at 645.

3. **Jury Instruction and Prosecutorial Argument on Mitigating Evidence**

Mr. Underwood contends that he is entitled to relief from his death sentence because one of the punishment stage jury instructions, and the State's use of it in closing arguments, unconstitutionally limited the jury's consideration of the mitigating evidence. The challenged instruction—Instruction No. 12—defined "[m]itigating circumstances" as

---

[10] Mr. Underwood does not contend—nor do we conclude—that the alleged prosecutorial misconduct infringed any specific constitutional right. He must therefore satisfy the *Donnelly* fundamental unfairness standard to show reversible constitutional error warranting habeas relief. *See Littlejohn*, 704 F.3d at 837.

"those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." O.R. at 1491.[11] The OCCA rejected this claim on the merits. *Underwood*, 252 P.3d at 244.

In addressing this claim, we begin with the relevant legal background and additional factual and procedural background. We then examine the OCCA's merits decision under § 2254(d) and conclude that it was not contrary to—or an unreasonable application of—Supreme Court law or based on an unreasonable determination of the facts. We therefore affirm the district court's denial of habeas relief on Mr. Underwood's claim about Instruction No. 12 and the related prosecutorial arguments.

a. *Legal background*

We first provide general background on the Constitution's requirements regarding the jury's consideration of mitigating evidence in capital sentencing proceedings. We then discuss *Grant v. Royal (Donald Grant)*, 886 F.3d 874 (10th Cir. 2018), in which this court recently considered and rejected a similar claim for habeas relief.

i. Overview

"[T]he Eighth and the Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (footnote omitted); *accord Eddings v.*

---

[11] "O.R." refers to the record filed in Mr. Underwood's direct appeal to the OCCA.

*Oklahoma*, 455 U.S. 104, 110 (1982). "[E]vidence, even if not related specifically to petitioner's culpability for the crime he committed . . . must be treated as relevant mitigating evidence if it serves as a basis for a sentence less than death." *Johnson v. Texas*, 509 U.S. 350, 381 (1993) (alterations, citations, and quotations omitted).

"The standard against which we assess whether jury instructions satisfy the rule of *Lockett* and *Eddings* was set forth in *Boyde v. California*, [494 U.S. 370 (1990)]." *Johnson*, 509 U.S. at 367. "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. The reasonable likelihood test also governs claims that "arguments by the prosecutor . . . reinforced an impermissible interpretation of [the challenged jury instruction] and made it likely that jurors would arrive at such an understanding." *Id.* at 834.

ii. *Grant v. Royal*

In *Grant*, this court denied a habeas petitioner's *Lockett*/*Eddings* claim based on punishment stage jury instructions and prosecutorial arguments analogous to those at issue in this case. The petitioner "argue[d] that one of the sentencing-phase jury instructions, Instruction 12, standing alone and in conjunction with the State's closing argument, unconstitutionally limited the jury's consideration of evidence presented in mitigation of his death sentence." *(Donald) Grant*, 886 F.3d at 930-31. The challenged instruction read: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." *Id.* at 931 (quotations omitted). During rebuttal closing argument, the prosecutor specifically

23

employed this language, telling the jury that "what the law says is that before something can be mitigating it must reduce the moral culpability or blame of the defendant." *Id.* at 937 (alterations omitted). And, in discussing the petitioner's mitigating evidence relating to his alleged schizophrenia, the prosecutor argued that it "does not in any way" reduce the petitioner's "moral culpability or blame." *Id.*

Applying AEDPA's deferential standard of review, we held that the OCCA neither contradicted nor unreasonably applied *Lockett*/*Eddings* and its progeny in rejecting the petitioner's challenge to Instruction 12 and the prosecution's statements relating to the instruction. *Id.* at 936. We reasoned that, "even if . . . the [prosecutorial] arguments . . . were improper, that would not necessarily mean that the OCCA was *unreasonable* in determining that there was no *Lockett* error because there was no reasonable likelihood that the jury was precluded . . . from considering . . . mitigating evidence . . . that did *not* extenuate or reduce [the petitioner's] moral culpability or blame." *Id.* at 938 (emphasis in original).

In reaching this result, we examined the record and found reasonable support for the OCCA's determination. <u>First</u>, in addition to the challenged "moral culpability or blame" language, Instruction 12 also included "language that vested the jury with the responsibility for determining what evidence was mitigating: 'The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.'" *Id.* at 940 (quoting Instruction 12). <u>Second</u>, a separate instruction— Instruction 13—"informed the jury that 'evidence had been introduced as to specified . . . *mitigating circumstances*' and then listed . . . factors that ordinarily would not be deemed

24

to have extenuated or reduced [the petitioner]'s moral culpability or blame." *Id.*
(alterations omitted) (emphasis in original) (quoting Instruction 13). Instruction 13 also
"ended with this admonition: 'In addition, you may decide that *other mitigating
circumstances exist*, and if so, you should consider those circumstances as well.'" *Id.*
(emphasis in original) (quoting Instruction 13). Third, a separate instruction—Instruction
17—"specifically admonished the jury that [the court's] instructions 'contain all the law
and rules you must follow.'" *Id.* at 941 (quoting Instruction 17). Fourth, in unchallenged
portions of the State's closing argument, the prosecutor "spent the lion's share of her time
casting doubt on the veracity, credibility, and weight of the evidence supporting the
mitigating circumstances that the court identified in Instruction 13." *Id.* at 942. Fifth,
"[a]t no point during her opening closing remarks did [the prosecutor] assert that the jury
was not free under the law to consider all of the mitigating factors that the court identified
in Instruction 13 on the ground that some of them did not extenuate or reduce moral
culpability or blame." *Id.* at 943.

b. *Relevant facts*

This section presents the relevant jury instructions and prosecutorial arguments on
the mitigating evidence given in the punishment stage of Mr. Underwood's trial.

i. Jury instructions

Three of the punishment stage jury instructions—12, 13, and 20—are relevant.

**Instruction 12**—the challenged instruction—contained identical language to
Instruction 12 in *Grant*: "Mitigating circumstances are those which, in fairness,
sympathy, and mercy, *may extenuate or reduce the degree of moral culpability or blame*.

25

The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." O.R. at 1491 (emphasis added).

**Instruction 13** also contained identical language to Instruction 13 in *Grant*: "Evidence has been introduced as to the following mitigating circumstances: [a list of 15 circumstances]. In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." O.R. at 1492-93.[12] As in

---

[12] Instruction 13 listed fifteen separate circumstances:

1. Kevin Ray Underwood was exposed to severe trauma and mistreatment by his peers while growing up, and got through life only with the aid of a close circle of "protectors".
2. Kevin Ray Underwood has, except for his crime against [J.B.], no prior history of any violent act.
3. Kevin Ray Underwood has, except for his crime against [J.B.] and a single speeding ticket, no prior history of violating any law.
4. Kevin Ray Underwood suffers from several psychological and psychiatric disorders including, but not limited to: schizotypal personality disorder, bi-polar disorder type II, multiple paraphilias, severe social phobia, anxiety, early onset of neuro-developmental disorder. None of these conditions has ever been appropriately treated by a mental health professional.
5. Kevin Ray Underwood was subjected to emotional and verbal abuse by his parents while growing up.
6. Kevin Ray Underwood has family and friends who love him, find meaning in his life, and will continue to visit him in prison.
7. Kevin Ray Underwood cooperated with law enforcement by giving a full confession to the murder of [J.B.].
8. Kevin Ray Underwood has expressed remorse for the killing of [J.B.]
9. Kevin Ray Underwood has spent most of his life on the fringe of society and constantly subjected to ridicule even into his adult years.

*Grant*, the circumstances enumerated in Instruction 13 included some that "ordinarily would not be deemed to have extenuated or reduced [the petitioner]'s moral culpability or blame." *(Donald) Grant*, 886 F.3d at 940 (quotations omitted). For instance, Instruction 13 listed circumstances pertaining to Mr. Underwood's childhood and the value others place in his life. *Compare* O.R. 1492 ("Kevin Ray Underwood was exposed to severe trauma and mistreatment by his peers while growing up") *with (Donald) Grant*, 886 F.3d at 940 ("A substantial portion of Donald Grant's childhood was spent in a violent and drug-infested neighborhood." (quotations omitted)); *compare* O.R. 1492 ("Kevin Ray Underwood has family and friends who love him, find meaning in his life, and will continue to visit him in prison.") *with (Donald) Grant*, 886 F.3d at 940 ("Donald Grant's life will be of value to other persons besides himself." (quotations omitted)).

---

10. Kevin Ray Underwood's multiple psychological and psychiatric problems have prevented him from taking full advantage of his intellect by continuing his education and gaining employment appropriate to his intelligence level.
11. Kevin Ray Underwood will not be around young children if sentenced to prison for life.
12. Kevin Ray Underwood is much more likely to be victimized in prison than posing a risk of violence to others. In fact, his chances of harming anyone in prison are very, very small.
13. The symptoms and effects of Kevin Ray Underwood's mental illnesses can be adequately controlled and lessened through appropriate and low-cost medication and treatment.
14. Kevin Ray Underwood comes from a family with a significant history of mental illness.
15. Kevin Ray Underwood has scored very low on scientific testing instruments designed to predict future violence.

O.R. at 1492-93.

**Instruction 20** again contained identical language to Instruction 17 in *Grant*, instructing the jury that court's instructions together "contain all the law and rules you must follow." O.R. at 1500.

### ii. Prosecutorial arguments

As in *Grant*, the prosecution's closing argument in the sentencing phase of Mr. Underwood's trial used the "moral culpability or blame" language from Instruction 12. In closing, the prosecution addressed the jury as follows: "[T]he law . . . [t]alks to you then about mitigating circumstances. Those are things which, in fairness, sympathy, and mercy, *may extenuate or reduce the degree of moral culpability or blame. Reduce the moral culpability or blame.* And you have a *list of a whole bunch of them.*" Trial Tr. Vol. X at 2518 (emphasis added).

The prosecution then attacked each of the circumstances listed in Instruction 13. For many of the circumstances, the prosecution attacked the quality and quantity of Mr. Underwood's evidence. *See, e.g.*, *id.* at 2518-19 ("[Defense counsel] talk[s] about that [Mr. Underwood] suffers from the psychological disorders. . . . He faked the test to look bad. You've got to wonder how you can trust or judge what he says when he's talking to a psychiatrist."). But for some of the circumstances, the prosecution's main or only attack invoked Instruction 12's "moral culpability or blame" framework. Regarding Mr. Underwood's alleged exposure to trauma and mistreatment by his peers, the prosecution stated: "[L]et's say he was. Does that reduce his blame for the killing of [J.B.]?" *Id.* at 2518. Regarding Mr. Underwood's alleged family support, the prosecution stated: "How does that, the fact that you have family and friends, reduce your blame for a crime?" *Id.*

28

at 2520. Regarding Mr. Underwood's alleged inability to obtain appropriate employment due to various psychiatric disorders, the prosecution stated: "So? How does that lessen his blame or culpability for the crime that he didn't have a very good job?" *Id.* at 2523. And regarding Mr. Underwood's alleged significant family history of mental illness, the prosecution stated simply: "So?" *Id.*

After remarking on each of the circumstances listed in Instruction 13, the prosecution concluded by advising the jury to "look at all of those mitigators" and to "decide what that means." *Id.* at 2525. In its rebuttal closing argument, the prosecution repeated many of the same points highlighted above.

c. *OCCA and federal district court decisions*

In his appeal to the OCCA, Mr. Underwood argued that the trial court's wording of Instruction 12 and the prosecution's arguments relating to it constituted reversible error. *Id.* at 244. The OCCA denied Mr. Underwood's *Lockett/Eddings* claim on the merits. *Id.* at 244-45. Mr. Underwood then sought federal habeas relief, which the district court denied. *Underwood*, 2016 WL 4059162, at *26.

d. *Analysis*

We review the OCCA's decision under §§ 2254(d)(1) and (d)(2) and conclude that it was not contrary to—or an unreasonable application of—clearly established Supreme Court law or based on an unreasonable determination of the facts.

i. Section 2254(d)(1): Reasonableness of legal determinations

The OCCA's conclusion that Instruction 12 and the prosecution's related arguments did not warrant relief was consistent with and a reasonable application of

29

*Lockett/Eddings* and its progeny.  As discussed above, *Grant* so held on facts

indistinguishable from this case in all relevant respects, and Mr. Underwood has offered

no reason why we should reverse this precedent.[13]  Nor could we, as "[w]e are bound by

the precedent of prior panels absent en banc reconsideration or a superseding contrary

decision by the Supreme Court."  *United States v. Meyers*, 200 F.3d 715, 720 (10th Cir.

2000) (quotations omitted).  We therefore cannot hold that the OCCA contradicted or

unreasonably applied *Lockett/Eddings* and its progeny in adjudicating Mr. Underwood's

claim.

ii.  Section 2254(d)(2):  Reasonableness of factual determinations

The OCCA did not base its conclusion—that Instruction 12 and the prosecution's

related arguments do not warrant relief—on an unreasonable factual determination.  Mr.

Underwood argues that the OCCA made "an unreasonable determination of facts in that

it misstate[d] the prosecution's argument."  Aplt. Br. at 52 n.18.  But the OCCA's

opinion nowhere misquoted the prosecution's argument.  Rather, the OCCA "found no

error" after "[c]onsidering the [prosecutorial] arguments as a whole."  *Underwood*, 252

P.3d at 244.  The "arguments as a whole" included "the prosecutor['s] t[elling] the jurors

that *they* were to decide what qualified as mitigating evidence, and that they could

---

[13] *Grant* in turn relied on this court's previous decision in *Hanson v. Sherrod*, 797 F.3d 810 (10th Cir. 2015), which also denied habeas relief on a *Lockett/Eddings* claim involving similar jury instructions and prosecutorial arguments.  We stated that "[t]hough the factual circumstances of *Hanson* are not entirely on all fours with [*Grant*], its mode of analysis is instructive and its substantive holding provides cogent support for the conclusion we reach [in *Grant*]."  *(Donald) Grant*, 886 F.3d at 939.  This statement applies equally here, where the factual circumstances are effectively on all fours with *Grant*.  But we need not discuss *Hanson*'s reasoning because *Grant* directly controls this case's resolution.

consider factors besides those advanced by the defense." *Id.* This court has previously characterized such statements as "'encourag[ing] the jury to consider all sorts of mitigating evidence,' including the kind that did not extenuate or reduce moral culpability or blame." *(Donald) Grant*, 886 F.3d at 942 (quoting *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015)).

4. **Unconstitutional Victim Impact Evidence**

Mr. Underwood contends that he is entitled to relief from his death sentence based on the trial court's admission of unconstitutional victim impact evidence. The OCCA found no error. *Underwood*, 252 P.3d at 248. In light of *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) (per curiam), however, the State concedes that the admission of the challenged evidence here—J.B.'s parents' sentence recommendations—violated the Eighth Amendment. The parties dispute whether this error warrants automatic relief, and, if not, whether this error prejudiced Mr. Underwood's defense.

In addressing this claim, we begin with general legal background on the Constitution's limitations on the admission of victim impact evidence in capital cases, as well as additional factual and procedural background relevant to Mr. Underwood's claim. We then consider the issues disputed by the parties, providing additional background as needed. Because the OCCA found no error and thus had no occasion to address these issues, we consider them de novo. *See Cole*, 755 F.3d at 1148 ("If a claim was not resolved by the state courts on the merits[,] . . . § 2254(d) . . . do[es] not apply . . . , [and] we review the [federal] district court's legal conclusions de novo and its factual findings, if any, for clear error."); *Lockett*, 711 F.3d at 1218 ("Because the OCCA erred in finding

31

no Eighth Amendment violation, we grant no deference to its harmless error analysis and consider the question de novo."). We conclude that the error here neither warrants automatic relief nor prejudiced the defense under the applicable standard. We therefore affirm the district court's denial of habeas relief on Mr. Underwood's claim based on the admission of J.B.'s parents' sentence recommendations.

a. *Legal background*

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court "held that 'the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence' that does not 'relate directly to the circumstances of the crime.'" *Bosse*, 137 S. Ct. at 1 (quoting *Booth*, 482 U.S. at 501-02, 507, n.10 (1987)). In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Court overruled *Booth* in part and held that the Eighth Amendment allows consideration of "'victim impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Id.* at 817, 827; *see Bosse*, 137 S. Ct. at 1-2.

The OCCA has long interpreted *Payne* as "implicitly overrul[ing] that portion of *Booth* regarding characterizations of the defendant and opinions of the sentence." *E.g.*, *Conover v. State*, 933 P.2d 904, 920 (Okla. Crim. App. 1997), *abrogated by Bosse*, 137 S. Ct. 904. This court has long disagreed with the OCCA. Starting with *United States v. McVeigh*, we have interpreted *Booth* and *Payne* to prohibit the prosecution from presenting sentencing recommendations from family members of the victim. 153 F.3d 1166, 1217 (10th Cir. 1998) ("*Payne* did not overrule the prohibitions in *Booth* against the admission of [victim's family members' sentence recommendations]"); *see also Hain*

*v. Gibson*, 287 F.3d 1224, 1238-39 (10th Cir. 2002) ("To date, three circuits, including our own, have expressly recognized that the portion of *Booth* prohibiting family members of a victim from stating 'characterizations and opinions about . . . the appropriate sentence' during the penalty phase of a capital trial survived the holding in *Payne* and remains valid.").

The Supreme Court recently clarified that the OCCA "remains bound by *Booth*'s prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence unless this Court reconsiders that ban" and that the OCCA "erred in concluding otherwise." *Bosse*, 137 S. Ct. at 2.

b. *Relevant facts—the sentence recommendations*

In the punishment stage of Mr. Underwood's trial, the trial court admitted victim impact testimony from J.B.'s mother and father that included their opinions about the appropriate sentence.[14] After J.B.'s mother testified to the impact of J.B.'s loss, the following exchange occurred:

Q: [L]et me ask you, do you have a *recommendation as to the appropriate punishment for this defendant*?
A: Yeah.
Q: And what is that?
A: He—*The death penalty. I don't have my little girl.*

---

[14] When the State noticed its intention to present these sentence recommendations, the trial court warned that "the Tenth Circuit is not real favorable to this kind of testimony but that it has been allowed in Oklahoma, but it is one of those things that could be a risk of reversal." Trial Tr. Vol. VIII at 1882. But the court agreed to admit the recommendations "[a]s long as [J.B.'s parents] kn[ew] that and they've made that choice," as was the case. *Id.*

Trial Tr. Vol. VIII at 1949-50 (emphasis added).  After J.B.'s father testified to the

impact of J.B.'s loss, a similar exchange occurred:

> Q:  Do you have a *recommendation for this jury as to what you believe is appropriate punishment for the murder of your daughter*?
> A:  Yes.
> Q:  Can you tell me what that is?
> A:  *Would be the death penalty*.

*Id.* at 1953-54 (emphasis added).

After the presentation of punishment stage evidence, the trial court instructed the

jury on the role of victim impact evidence:  "This evidence is simply another method of

informing you about *the specific harm caused by the crime in question*.  You may

consider this evidence in determining an appropriate punishment.  However, your

consideration must be limited to a moral inquiry into the culpability of the defendant, *not*

*an emotional response to the evidence*."  O.R. at 1499 (emphasis added).

At no point in its closing argument did the prosecution expressly refer to J.B.'s

parents' sentence recommendations.  It merely summarized other portions of their victim

impact statements, emphasizing that J.B.'s death "is a loss that her family will never

recover from."  Trial Tr. Vol. X at 2527.  It also advised the jury that the impact

statements spoke to "the specific harm that [J.B.'s] murder caused" and could be

considered in determining the appropriate punishment.  *Id.* at 2526.  In rebuttal, the

prosecution "submit[ted] to [the jury]" that "anything less" than death would be "an

injustice for [J.B.]" and "an injustice for that family sitting right there."  *Id.* at 2565.

34

c. *OCCA and federal district court decisions*

In his appeal to the OCCA, Mr. Underwood argued that the trial court's admission of J.B.'s parents' sentence recommendations constituted reversible error. *Underwood*, 252 P.3d at 248. The OCCA denied Mr. Underwood's *Booth* claim on the merits, finding no error. *Id.* Mr. Underwood then sought federal habeas relief, which the district court denied because it determined that the error was harmless under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Underwood*, 2016 WL 4059162, at *18-*19.

d. *Structural error, Footnote Nine error, or trial error*

Mr. Underwood contends that he is entitled to automatic relief from his death sentence based on the concededly unconstitutional admission of J.B.'s parents' sentence recommendations at his trial. The State disagrees, arguing that Mr. Underwood is entitled to relief only if the *Booth* error was not harmless under *Brecht*. Mr. Underwood submits that the *Booth* error warrants automatic relief because (1) it was structural error, and (2) it falls under the class of errors that infect a proceeding's integrity, as described in footnote nine of *Brecht* ("Footnote Nine").

In addressing Mr. Underwood's arguments, we first provide additional legal background. We then consider Mr. Underwood's arguments and conclude that he is not entitled to automatic relief based on the conceded *Booth* error here.

i. <u>Additional legal background</u>

On habeas review, we ordinarily apply the *Brecht* standard to determine whether constitutional error warrants relief from the challenged conviction or sentence. Under

this standard, constitutional error may be disregarded unless found to have "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. "If a reviewing court is in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must win." *Crease v. McKune*, 189 F.3d 1188, 1193 (10th Cir. 1999) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). "In harmless error analysis in a capital case, we are mindful of the need for heightened reliability in determining a capital sentence." *Mollett v. Mullin*, 348 F.3d 902, 920 (10th Cir. 2003) (quotations omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995) ("[O]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." (quotations omitted)).

We provide additional background on two circumstances where constitutional error alone requires reversal and the harmless error doctrine therefore does not apply:  (1) structural error, and (2) Footnote Nine error.

### 1)  Structural error

Notwithstanding *Brecht*, constitutional errors that rise to the level of "structural error"—in contrast to ordinary "trial error"—require automatic reversal.  As the Supreme Court explained in *Arizona v. Fulminante*, "'trial error' . . . occur[s] during the presentation of the case to the jury, and . . . may therefore be . . . assessed . . . to determine whether its admission was harmless beyond a reasonable doubt," whereas "structural defects in the constitution of the trial mechanism . . . defy analysis by 'harmless-error' standards."  499 U.S. 279, 307-08 (1991).

"A defining feature of structural error is that the resulting unfairness or prejudice is necessarily unquantifiable and indeterminate, such that any inquiry into its effect on the outcome of the case would be purely speculative." *United States v. Solon*, 596 F.3d 1206, 1211 (10th Cir. 2010) (quotations omitted); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006) ("[A]s we have done in the past, we rest our conclusion of structural error upon the difficulty of assessing the effect of the error."). In contrast, the effect of ordinary trial errors "may 'be quantitatively assessed in the context of other evidence presented.'" *Gonzales-Lopez*, 548 U.S. at 148 (quoting *Fulminante*, 499 U.S. at 307-08).

The Supreme Court has recognized the following categories of structural error: "a total deprivation of the right to counsel; the lack of an impartial trial judge; the unlawful exclusion of grand jurors of defendant's race; a deprivation of the right to self-representation at trial; the denial of the right to a public trial; and an erroneous reasonable-doubt jury instruction." *Solon*, 596 F.3d at 1211.

### 2) Footnote Nine error

Apart from structural error, the Supreme Court in *Brecht* suggested another potential type of error warranting automatic relief. In Footnote Nine, the Court stated that *Brecht* "does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." 507 U.S. at 638 n.9.

This court has not previously had occasion to apply Footnote Nine to a *Booth* error involving the admission of unconstitutional sentence recommendations in a capital case. But we find *Duckett v. Mullin*, 306 F.3d 982 (10th Cir. 2002), in which we applied Footnote Nine to alleged prosecutorial misconduct, instructive.

In *Duckett*, the habeas petitioner argued for application of *Brecht*'s Footnote Nine exception to the harmless error doctrine based on the Oklahoma prosecutor's improper remarks in both the guilt and sentencing stages of the trial. *Id.* at 993. The prosecutor in *Duckett* had made improper remarks such as, in arguing for the death sentence, asking the jury whether it would serve "justice [to] send this man down to prison, let him have clean sheets to sleep on every night, three good meals a day, visits by his friends and family, while [the victim] lies cold in his grave?" *Id.* at 992.

This particular prosecutor "ha[d] been chastised for participating in the same type of improper argumentation in other cases." *Id.* at 993. Both the OCCA and federal courts had "repeatedly condemned [him] and prosecutors from his office for their habitual misconduct in argument." *Id.* at 993 n.4 (quotations omitted). Accordingly, "our past experiences with this prosecutor le[ft] us convinced that his inappropriate commentary at trial was intentional and calculated." *Id.* at 993 (quotations omitted). We further observed that the prosecutor's "persistent misconduct . . . has without doubt harmed the reputation of Oklahoma's criminal justice system and left the unenviable legacy of an indelibly tarnished legal career." *Id.* at 994. And we emphasized that "[o]ur nation's confidence in the fair and just administration of the death penalty is disserved by prosecutors who cynically test the bounds of the harmless-error doctrine." *Id.*

Even so, we determined that the challenged prosecutorial misconduct did not rise to the level of Footnote Nine error, noting that "[t]he due process concerns flagged by footnote nine of *Brecht* will manifest themselves only in very limited circumstances." *Id.* at 994-95. Specifically, we stated that the key inquiry governing "whether the footnote's exemption will be applicable 'is whether the integrity of the proceeding was so infected that the entire trial was unfair[,]'" and we could not conclude that that was so on *Duckett*'s facts. *Id.* at 995 (quoting *Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir. 1994)); *see also Torres v. Mullin*, 317 F.3d 1145, 1159 (10th Cir. 2003) (declining to apply Footnote Nine in a post-*Duckett* case involving the same Oklahoma prosecutor).

ii. Analysis

Mr. Underwood is not entitled to automatic relief because the *Booth* error here constituted neither structural error nor Footnote Nine error. We address each argument in turn.

1) Structural error

The admission of J.B.'s parents' sentence recommendations does not amount to structural error. The error's effect may be evaluated in light of the other evidence at trial and thus is not "necessarily unquantifiable and indeterminate." *Solon*, 596 F.3d at 1211.

Mr. Underwood contends that "judges from this Court have indicated, rightly so, that sentencing recommendations by victim's family members can rise to the level of structural error, requiring automatic reversal." Aplt. Suppl. Br. at 5-6 (citing *Hain*, 287 F.3d at 1239 n.11; *DeRosa v. Workman*, 696 F.3d 1302, 1305 (10th Cir. 2012) (Mem.) (Lucero, J., dissenting from denial of rehearing en banc)). We disagree. In *Hain*, we

39

remarked that "[t]he decision in *Booth* does not expressly indicate whether the [Supreme] Court believed [victim impact] errors to be trial errors subject to harmless error review, or structural error requiring automatic reversal." 287 F.3d at 1239 n.11. We "[n]evertheless . . . d[id] not believe the OCCA unreasonably applied *Booth* in concluding that such errors are subject to harmless error review." *Id.*

Since *Hain*, we have repeatedly applied *Brecht*'s harmless error analysis to *Booth* errors on de novo review, thus necessarily concluding that such errors are indeed subject to harmless error review. *See, e.g.*, *Grant v. Trammell (John Grant)*, 727 F.3d 1006, 1016-17 (10th Cir. 2013). Contrary to Mr. Underwood's assertion, Judge Lucero did not disagree with this legal conclusion in his dissent from the denial of rehearing en banc in *DeRosa*. *See DeRosa*, 696 F.3d at 1305 ("*Were the option not foreclosed by precedent*, one could make a strong case that the [OCCA's] pattern of ignoring the United States Supreme Court should be immune from harmless error review as akin to structural error." (emphasis added)).

### 2) Footnote Nine error

The admission of J.B.'s parents' sentence recommendations does not amount to Footnote Nine error. As discussed above, "[t]he due process concerns flagged by footnote nine of *Brecht* will manifest themselves only in very limited circumstances." *Duckett*, 306 F.3d at 994-95. Mr. Underwood contends that we are faced with such a circumstance here. He asserts that the "OCCA, state trial judges, and prosecutors have repeatedly and deliberately violated capital defendants' Eighth Amendment rights through the admission of victim[s'] family members' sentencing recommendations."

40

Aplt. Suppl. Br. at 6.  He further asserts that "this pattern has impugned the very integrity of the fair trial process."  *Id.* at 6-7.

We agree that the OCCA has disregarded longstanding Supreme Court precedent and has refused to recognize *Booth* errors.  But even in *Duckett*, where we acknowledged that the prosecutor's flagrant and persistent misconduct was "emphatically not condoned by this court . . . [and] has without doubt harmed the reputation of Oklahoma's criminal justice system," we nevertheless said that the application of Footnote Nine requires more—it requires that the error "in *the present case* so infected the trial as to make the proceeding fundamentally unfair and thus immune from harmless-error review."  306 F.3d at 994, 995 (emphasis added).  *Duckett* therefore compels us to conclude that the trial in *the present case* was not rendered fundamentally unfair by the *Booth* error, notwithstanding the fact, as Mr. Underwood puts it, "that Oklahoma courts and prosecutors have continued to pursue the very victim-impact evidence precluded by *Booth*—for nearly 30 years."  Aplt. Suppl. Br. at 6-7.

e.  Brecht *harmless error analysis*

Mr. Underwood contends that he is entitled to relief from his death sentence because he can show "substantial and injurious effect" under the *Brecht* standard.  We first provide additional background on this court's application of *Brecht* to the admission of unconstitutional sentence recommendations.  We then summarize the mitigating and aggravating evidence presented at Mr. Underwood's trial to provide context for our analysis.  Guided by our precedents, we evaluate the conceded *Booth* error's prejudicial impact in light of this context and conclude that it does not warrant habeas relief.

41

i. Additional legal background

This court has held that the admission of unconstitutional victim sentence recommendations required reversal under the *Brecht* standard in only one case: *Dodd v. Trammell*, 753 F.3d 971 (10th Cir. 2013). Before *Dodd*, "no prior panel of this court ha[d] ruled that victim recommendations of the death penalty required reversal." *Id.* at 997. The *Dodd* panel acknowledged ten previous decisions holding "that such testimony was harmless." *Id.*[15] It cited three factors warranting a different result in that case: (1) "the sheer volume of [the unconstitutional] testimony," which included a "drumbeat" of seven death recommendations; (2) that the jury did not find the HAC aggravator or the continuing threat aggravator;[16] and (3) that the defendant's guilt "was not as clear cut" as in previous decisions, due to the prosecution's sole reliance on circumstantial evidence. *Id.* at 997-98. Based on these factors, the panel found itself "in grave doubt about the effect of the error on the jury's sentencing decision" and held that "the admission of the

_____

[15] The panel cited *(John) Grant*, 727 F.3d at 1015–17; *Lockett*, 711 F.3d at 1226, 1238–40; *Lott v. Trammell*, 705 F.3d 1167, 1202, 1214, 1218–19 (10th Cir. 2013); *DeRosa v. Workman*, 679 F.3d 1196, 1236–37, 1240 (10th Cir. 2012), *reh'g denied in DeRosa*, 696 F.3d 1302; *Selsor v. Workman*, 644 F.3d 984, 1025, 1027 (10th Cir. 2011); *Welch v. Workman (Gary Welch)*, 639 F.3d 980, 996–1000, 1002–04 (10th Cir. 2011); *Welch v. Sirmons (Frank Welch)*, 451 F.3d 675, 703–04 (10th Cir. 2006); *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002); *Willingham v. Mullin*, 296 F.3d 917, 930–32 (10th Cir.2002); and *Hain*, 287 F.3d at 1234–36, 1239–40. *Dodd*, 753 F.3d 971 at 997.

[16] The *Dodd* panel noted that in seven of the ten decisions it reviewed, the jury found the HAC aggravator and that, in two of the remaining three decisions, the jury found the continuing threat aggravator. 753 F.3d at 998. And "[i]n the only case in which the jury did not find either [of these] aggravator[s], the two victim statements 'did not expressly refer to the defendant being put to death; instead, they both simply stated without embellishment that they agreed with the prosecution's "recommended sentence."'" *Id.* (alterations omitted) (quoting *Selsor*, 644 F.3d at 1027).

42

sentence recommendations in this case was not harmless." *Id.* at 999 (citations and quotations omitted).

ii. Additional relevant facts

To determine whether J.B.'s parents' statements had a substantial and injurious effect on the jury's sentencing decision, we must consider them in the overall context of the trial and the "record as a whole." *Brecht*, 507 U.S. at 638; *see also Lockett*, 711 F.3d at 1239 ("In evaluating whether the unconstitutional portions of the [victim impact] statement had a substantial and injurious effect on the jury, we must consider it in the context of all of the aggravating and mitigating evidence."). We therefore summarize the aggravating and mitigating evidence presented during the sentencing phase of Mr. Underwood's trial.

1) The aggravating case

The State's aggravating case consisted primarily of the guilt stage evidence, which it incorporated into the punishment stage. The guilt stage evidence included, most notably, the video recording and transcript of Mr. Underwood's interview with the FBI, during which, as the OCCA wrote, he "describe[d] how he had recently developed a desire to abduct a person, sexually molest them, eat their flesh, and dispose of their remains" and "explain[ed] in considerable detail how he attempted to carry out this plan on [J.B.], whom he had decided was a convenient victim." *Underwood*, 252 P.3d at 231. These details included that he had (1) "hit [J.B.] on the back of the head several times with a wooden cutting board" and heard her "scream[ing] in pain and beg[ing] him to stop," (2) "suffocate[d] [J.B.] by sitting on her and placing his hand across her face . . .

43

[for] fifteen to twenty minutes," (3) "attempted to have sexual relations with [J.B.]'s body," and (4) "attempted to decapitate [J.B.'s body] with a knife." *Id.* The guilt stage evidence also included crime scene photographs taken at Mr. Underwood's apartment, photographs of J.B.'s body taken at the Medical Examiner's office, and physical items taken from Mr. Underwood's apartment that corroborated his confession.[17]

### 2) The mitigating case

Mr. Underwood's mitigating case consisted of testimony from 19 witnesses over three days. They included family members, friends, former teachers, supervisors, and coworkers who had known Mr. Underwood at various points in his life, a physician who had treated Mr. Underwood for depression, jail officials who had had contact with Mr. Underwood since his arrest, and three experts who had evaluated Mr. Underwood's psychological and psychiatric health and his likelihood of committing future violence.[18]

After hearing this testimony, the jury was instructed that "[e]vidence ha[d] been introduced as to the following mitigating circumstances:"

1. Kevin Ray Underwood was exposed to severe trauma and mistreatment by his peers while growing up, and got through life only with the aid of a close circle of "protectors".

2. Kevin Ray Underwood has, except for his crime against [J.B.], no prior history of any violent act.

---

[17] For example, the State entered into evidence the cutting board that Mr. Underwood described using to hit J.B. in his confession. State's Trial Exhibit 171.

[18] The State called its own expert to rebut the defense experts' testimony. Trial Tr. Vol. X at 2427-88.

3. Kevin Ray Underwood has, except for his crime against [J.B.] and a single speeding ticket, no prior history of violating any law.

4. Kevin Ray Underwood suffers from several psychological and psychiatric disorders including, but not limited to: schizotypal personality disorder, bi-polar disorder type II, multiple paraphilias, severe social phobia, anxiety, early onset of neuro-developmental disorder. None of these conditions has ever been appropriately treated by a mental health professional.

5. Kevin Ray Underwood was subjected to emotional and verbal abuse by his parents while growing up.

6. Kevin Ray Underwood has family and friends who love him, find meaning in his life, and will continue to visit him in prison.

7. Kevin Ray Underwood cooperated with law enforcement by giving a full confession to the murder of [J.B.].

8. Kevin Ray Underwood has expressed remorse for the killing of [J.B.].

9. Kevin Ray Underwood has spent most of his life on the fringe of society and constantly subjected to ridicule even into his adult years.

10. Kevin Ray Underwood's multiple psychological and psychiatric problems have prevented him from taking full advantage of his intellect by continuing his education and gaining employment appropriate to his intelligence level.

11. Kevin Ray Underwood will not be around young children if sentenced to prison for life.

12. Kevin Ray Underwood is much more likely to be victimized in prison than posing a risk of violence to others. In fact, his chances of harming anyone in prison are very, very small.

45

13. The symptoms and effects of Kevin Ray Underwood's mental illnesses can be adequately controlled and lessened through appropriate and low-cost medication and treatment.

14. Kevin Ray Underwood comes from a family with a significant history of mental illness.

15. Kevin Ray Underwood has scored very low on scientific testing instruments designed to predict future violence.

O.R. at 1492-93.

iii. Analysis

Based on our careful review of the entire record, we conclude, guided by our precedents, that the admission of J.B.'s parents' sentencing recommendations did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. Three considerations taken together lead us to this conclusion: (1) the offending statements were relatively brief and emotionally restrained; (2) the aggravating case was relatively strong; and (3) the mitigating case, while not insubstantial, was not sufficient to overcome the aggravating evidence. In discussing these considerations below, we also note that none of the factors that warranted reversal in *Dodd* are present in this case.

1) The sentence recommendations

The offending statements, J.B.'s parents' sentence recommendations, were "relatively pallid in comparison to other victim impact statements this circuit has found harmless." *Lockett*, 711 F.3d at 1239. In response to the prosecution's question eliciting their sentence recommendation, J.B.'s mother stated "The death penalty. I don't have my

46

little girl." and J.B.'s father stated "Would be the death penalty." Trial Tr. Vol. VIII at 1950, 1954. "This court has held far more extensive pleas to lack the required 'substantial and injurious' effect on a jury's verdict when the evidence against the defendant at sentencing was strong." *(John) Grant*, 727 F.3d at 1017; *see also Lockett*, 711 F.3d at 1239 ("The [victim's parents]' request for the death penalty was a single, concise sentence. In contrast, the three victim statements that were held to be harmless in [*Welch v. Workman*, 639 F.3d 980, 990, 999 (10th Cir. 2011)] contained extremely emotional pleas for the death penalty.").

"Further, the jury was properly instructed by the trial court on the . . . proper role of victim-impact evidence." *DeRosa v. Workman*, 679 F.3d 1196, 1237 (10th Cir. 2012), *reh'g denied in DeRosa*, 696 F.3d 1302; *see* O.R. at 1499 ("[Y]our consideration must be limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence."). "As a general rule, we presume that juries follow [limiting] instructions." *United States v. Lane*, 883 F.2d 1484, 1498 (10th Cir. 1989).

Finally, unlike in *Dodd*, in which the State "went to the extraordinary length of eliciting [a death penalty] recommendation from six, and perhaps seven, . . . witnesses,"[19] the sentence recommendations presented at Mr. Underwood's trial were more akin to a "one-off or a mere aside" than "a drumbeat." 753 F.3d at 997.

---

[19] In *Dodd*, six of the State's witnesses recommended death in response to a question posed by the prosecutor, while a seventh witness "included her recommendation of the death sentence in the statement she read to the jury." 753 F.3d at 997.

47

2) The aggravating case

Although the jury found that only one aggravating circumstance—the HAC aggravator—existed beyond a reasonable doubt, the aggravating case against Mr. Underwood was relatively strong. The existence of the HAC aggravator in itself provides a relatively strong basis for the death penalty as compared to the other aggravating circumstances (apart from the continuing threat aggravator). *See Dodd*, 753 F.3d at 998 ("This was also a significantly weaker case for the death penalty. Unlike seven of our precedents, the jury did not find the [HAC] aggravating circumstance."). Moreover, "the evidence of [this] aggravating circumstance[] was substantial." *Lockett*, 711 F.3d at 1240. The jury heard Mr. Underwood's confession, in which he acknowledged the planned nature of the crime, exhibited comprehension of its wrongfulness, and recounted its brutal details, including J.B.'s resistance, his feelings of sexual arousal, and his efforts to decapitate her.[20]

---

[20] *See* State's Trial Exhibit 162 at 27 ("I certainly planned this out, I mean I'd been thinkin' about it for at least a month."); *id.* at 41 ("I know what I did was wrong, and . . . I know that I deserve to be punished for it."); *id.* at 56 ("[W]hen she first came in [to the apartment], it was like oh, now's my chance, but then, you know, then I had to say no, I can't do it, and I just kinda struggled with myself the whole times she was in there."); *id.* at 59 ("[T]hen finally I was just like you know, either do it or tell her to get the hell out of the apartment, . . . and finally I did it."); *id.* at 61 ("I whacked her with [a cutting board], and she's . . . like ouww, and started crying and she's like, oh God I'm sorry . . . so I whacked her again, and she jumped up, and . . . I couldn't believe it didn't knock her out."); *id.* at 62 ("[A]fter I hit her a couple times, I finally just had to, you know jump up and grab her, and . . . I couldn't believe how strong she was. I could barely hold her down."); *id.* at 63 ("[O]nce I . . . finally got her down to the ground, . . . we struggled. [I]t took me probably fifteen, twenty minutes to kill her."); *id.* (I was, kinda sittin' on her . . . clamping . . . my hand on her [face and nose]."); *id.* at 67-68 ("I was gonna try to have sex with her . . . , but the way she was like laying right on the floor I couldn't really get to her very good."); *id.* at 69-71 ("And so I was like . . . I'm just gonna go ahead and

48

Finally, in contrast to *Dodd*, guilt in this case, established in large part by Mr. Underwood's own confession, "was . . . as clear cut as in cases in which we have ruled that victim recommendations were harmless." 753 F.3d at 998.

### 3) The mitigating case

Mr. Underwood's mitigating case, as summarized above, contained substantial testimony addressing multiple mitigating factors. In closing argument, defense counsel emphasized the strongest parts of the case for mitigation. Counsel emphasized Mr. Underwood's various mental health issues, repeatedly describing him as "a disturbed and conflicted, mentally ill young man when he committed this terrible crime." Trial Tr. Vol. X at 2536; *see also id.* at 2538-39, 2541-43, 2546. Counsel also referenced the testimony given by the defense team's psychiatric expert, Dr. Martin Kafka—that proper treatment could potentially lessen the effects of Mr. Underwood's psychiatric disorders and paraphilias. *Id.* at 2545; *see* Trial Tr. Vol. IX at 2262-65.

The mitigation case, in particular the evidence pertaining to his psychiatric disorders and his amenability to treatment, was not, as we have said in another case, "less than compelling." *Selsor v. Workman*, 644 F.3d 984, 1027 (10th Cir. 2011) (finding a *Booth* error harmless under *Brecht* in part based on the weakness of the mitigating evidence, which consisted of testimony from one jail employee and four prison employees, two of whom conceded that the habeas petitioner's prison record was simply

---

drag her into the tub and behead her . . . . [S]o I started sawing at her neck . . . . I went to her spine and I, just sawed and sawed and sawed, and could not get through that last."); *id.* at 71 ("I was disgusted at first, but then once I was climbing down on top of her, holding her down and choking her, I got aroused again.").

"a little better than average" (quotations omitted)). Although stronger than the evidence in *Selsor*, Mr. Underwood's evidence was not sufficiently compelling as to put us in "grave doubt" as to the *Booth* error's harmlessness, in light of the strength of the aggravating circumstance in this case. *See (John) Grant*, 727 F.3d at 1017 ("To be sure, [the petitioner] did respond with evidence of his amenability to treatment and evidence about his troubled childhood. But even viewed in its totality the case against him remained considerable.").[21] "Lastly, the jury was properly instructed on the use of mitigating evidence and its role in the sentencing deliberations," further reducing the likelihood that the admission of J.B.'s parents' testimony prejudiced Mr. Underwood's defense. *Selsor*, 644 F.3d at 1027 (alterations and quotations omitted).

---

[21] Mr. Underwood's three expert witnesses generally agreed that he suffered from a variety of psychological and psychiatric disorders, including, most notably: schizotypal personality disorder, the less severe of the two types of bipolar disorder, depression, anxiety, and social phobia. Trial Tr. Vol. IX at 2178-82, 2251-62, 2327-31. The State's rebuttal expert, who did not personally evaluate Mr. Underwood but reviewed the defense experts' work, testified that he "would . . . defer to their diagnoses" and "ha[d] no reason to doubt those diagnoses and their competence as examiners." Trial Tr. Vol. X at 2472-73.

But even with these diagnoses, "[the defense experts'] testimony never indicated that Mr. [Underwood]'s [mental health issues] caused his behavior to be 'impulsive' or 'aggressive' in a way that would *meaningfully explain* his involvement in [J.B.'s] murder[]," thus reducing the mitigating force of the mental health evidence in this case. *See (Donald) Grant*, 886 F.3d at 922 (emphasis in original). Indeed, Dr. Kafka testified that, "even though [Mr. Underwood's violent and sexual] thoughts themselves were impulsive-like . . . in that . . . they were just vibrating back and forth in his mind, . . . he put them into a plan of action that was *planned out and not impulsive*." Trial Tr. Vol. IX at 2261 (emphasis added). And Mr. Underwood self-reported on a sexual compulsive disorder questionnaire that he "ha[s] much control and [is] usually able to stop or divert sexual obsessions with some effort and concentration." *Id.* at 2226.

Based on the foregoing, Mr. Underwood is not entitled to relief because the *Booth* error here does not warrant automatic reversal and, applying *Brecht*, "[g]iven that this case contains similarly strong evidence [as in previous cases] against the defendant and yet a comparatively muted pair of pleas, we are hard pressed to see how we could, faithful to our precedent, find . . . reversible error." *(John) Grant*, 727 F.3d at 1017.

5. **Jury's Weighing of Aggravating and Mitigating Circumstances**

Mr. Underwood contends that he is entitled to relief from his death sentence because it was unconstitutionally imposed without a jury finding beyond a reasonable doubt that the HAC aggravator outweighed the mitigating evidence. The OCCA rejected this claim on the merits. *Underwood*, 252 P.3d at 246.

In addressing this claim, we begin with the relevant legal background and additional factual and procedural background. We then examine the OCCA's merits decision under § 2254(d) and conclude that it was not contrary to—or an unreasonable application of—Supreme Court law or based on an unreasonable determination of the facts. We therefore affirm the district court's denial of habeas relief on Mr. Underwood's claim that the state trial court failed to require the jury to find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

a. *Legal background*

We first provide a general overview of the reasonable doubt standard's applicability to capital sentencing facts. We then discuss *Matthews v. Workman*, 577

51

F.3d 1175 (10th Cir. 2009), in which this court previously considered and rejected the same challenge to Oklahoma's capital sentencing scheme before us in this appeal.

i.  Overview

The Fourteenth Amendment right to due process and the Sixth Amendment right to a jury trial, taken together, entitle a criminal defendant to "a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000) (brackets and quotations omitted).  In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" is an element that "must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court applied the *Apprendi* rule in invalidating Arizona's capital sentencing system.  Arizona's system authorized judges to make the factual finding necessary for imposing the death sentence—that at least one aggravating circumstance existed.  *Ring*, 536 U.S. at 597-98.  The Court held that "[b]ecause Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense [by increasing the maximum penalty], . . . the Sixth Amendment requires that they be found by a jury." *Id.* at 609 (citations and quotations omitted).[22]

---

[22] The Arizona scheme invalidated in *Ring* required *judge*-made findings of aggravating circumstances beyond a reasonable doubt.  536 U.S. at 597.  In contrast, Oklahoma's scheme requires *jury*-made findings that (1) at least one aggravating circumstance exists and (2) the aggravating circumstance(s) outweigh the mitigating.  Mr. Underwood nevertheless contends that Oklahoma's scheme violates *Apprendi* because, although the jury must make the first determination beyond a reasonable doubt, it need

The Supreme Court likewise applied *Apprendi* in invalidating Florida's capital sentencing scheme in *Hurst v. Florida*, 136 S. Ct. 616 (2016). Under Florida's scheme, the trial court alone made the findings necessary for imposing the death penalty: that (1) "sufficient aggravating circumstances exist," and (2) "there are insufficient mitigating circumstances to outweigh the aggravating circumstances." *Hurst*, 136 S. Ct. at 622 (quotations omitted). But the Supreme Court's holding in *Hurst* only referenced the first of these required findings: "Florida's sentencing scheme, which required the judge alone to *find the existence of an aggravating circumstance*, is therefore unconstitutional." *Id.* at 624 (emphasis added). The Court thus did not address whether the second of the required findings—that mitigating circumstances do not outweigh the aggravating circumstances—is also subject to *Apprendi*'s rule.

ii. *Matthews v. Workman*

In *Matthews*, this court rejected an *Apprendi* challenge to Oklahoma's capital sentencing scheme. Under Oklahoma's scheme, the death penalty may not be imposed "[u]nless at least one of the statutory aggravating circumstances . . . is [found by a unanimous jury beyond a reasonable doubt] or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances." Okla. Stat. tit. 21, § 701.11. The *Matthews* petitioner sought habeas relief based on the trial court's punishment stage jury instructions, arguing that the jury should "have been

not do so as to the second. Even though Oklahoma's scheme does not allow judge-made findings, we consider *Ring* in addressing Mr. Underwood's claim because the *Apprendi* rule entitles a defendant to a determination by the jury and also to a determination beyond a reasonable doubt of "any fact . . . that increases the maximum penalty for a crime." *Apprendi*, 530 U.S. at 476.

instructed that it had to find *beyond a reasonable doubt* that aggravating factors

outweighed the mitigating." *Matthews*, 577 F.3d at 1195 (emphasis in original).

Considering the issue de novo, we held that the weighing of aggravating and mitigating

circumstances under Oklahoma's scheme is not subject to the *Apprendi* rule because it "is

not a finding of fact . . . but a highly subjective, largely moral judgment regarding the

punishment that a particular person deserves." *Id.* (quotations omitted).[23]

b. *Relevant facts*

In the punishment stage of Mr. Underwood's trial, the trial court instructed the

jury in accordance with Oklahoma's capital sentencing scheme:

> If you unanimously find that one or more of the aggravating
> circumstances existed beyond a reasonable doubt, the death
> penalty shall not be imposed unless you also unanimously
> find that any such aggravating circumstance or circumstances
> outweigh the finding of one or more mitigating
> circumstances. Even if you find that the aggravating
> circumstances outweigh the mitigating circumstance, you
> may impose a sentence of imprisonment for life with the
> possibility of parole or imprisonment for life without the
> possibility of parole.

O.R. at 1494. The jury was therefore not instructed to find that the aggravating

circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

---

[23] Two state supreme courts have taken the opposite approach in applying *Apprendi* to the weighing of aggravating and mitigating circumstances in capital sentencing. *See Hurst v. State*, 202 So.3d 40, 44 (Fla. 2016) (interpreting *Hurst* as requiring that "all critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury," including "the finding that the aggravating factors outweigh the mitigating circumstances"); *Rauf v. State*, 145 A.3d 430, 434 (Del. 2016) (invalidating Delaware's capital sentencing scheme in part because it did not require a jury to find that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt).

c. *OCCA and federal district court decisions*

In his appeal to the OCCA, Mr. Underwood argued that the failure to instruct the jury to find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt constituted reversible error. *Underwood*, 252 P.3d at 246. The OCCA denied Mr. Underwood's *Apprendi* claim on the merits, citing *Matthews*. *Id.* Mr. Underwood then sought federal habeas relief, which the district court denied. *Underwood*, 2016 WL 4059162, at \*31.

d. *Analysis*

We review the OCCA's decision under § 2254(d)(1) and conclude that it was not contrary to—or an unreasonable application of—clearly established Supreme Court law.[24] *Matthews* forecloses us from concluding otherwise. *Matthews* held that Oklahoma's capital sentencing scheme does not violate *Apprendi* even though it does not require the jury to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. *Matthews*, 577 F.3d at 1195. We therefore cannot hold that the OCCA contradicted or unreasonably applied *Apprendi* in adjudicating Mr. Underwood's claim. *See Meyers*, 200 F.3d at 720 ("We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." (quotations omitted)); *see also Lockett*, 711 F.3d at 1254-55 (holding that an analogous *Apprendi* claim was "foreclosed by our decision . . . in . . . *Matthews*").

---

[24] Mr. Underwood does not—nor do we—identify any § 2254(d)(2) unreasonable factual determination underlying the OCCA's adjudication of the *Apprendi* claim.

Mr. Underwood makes much of the Supreme Court's references in *Hurst* to judicial weighing of aggravating and mitigating circumstances under the Florida scheme it invalidated. *Hurst* post-dates the OCCA's decision and thus cannot serve as clearly established federal law for purposes of our review under AEDPA. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011) (explaining that § 2254(d)(1) "requires federal courts . . . to measure state-court decisions against [the Supreme] Court's precedents as of the time the state court renders its decision." (quotations omitted)). We do not treat it as such in considering whether the OCCA's decision was reasonable under § 2254(d)(1). We instead address whether *Hurst* enables us to overrule *Mathews*, which forecloses Mr. Underwood's argument that the OCCA's decision was contrary to or an unreasonable application of the preexisting Supreme Court decisions, absent en banc reconsideration.

*Hurst* does not supply a superseding contrary Supreme Court decision that would allow us to overrule *Matthews*. Although *Hurst* contains some preliminary discussion of Florida judges' authority to both find and weigh aggravating circumstances independently of the jury in capital cases, it invalidated Florida's scheme specifically "to the extent [it] allow[s] a sentencing judge to *find an aggravating circumstance . . .* that is necessary for imposition of the death penalty." 136 S. Ct. at 622, 624 (emphasis added). Because *Hurst* did not directly address *Apprendi*'s application to the weighing of aggravating and mitigating circumstances, it does not contravene *Matthews*.

6. **Cumulative Error**

Finally, Mr. Underwood contends that the errors he alleges, taken together, deprived him of a fair trial. "Because the OCCA [found no error and thus] did not

56

conduct a cumulative-error analysis . . ., we must perform our own de novo, employing

the well-established standard found in *Brecht*." *(Donald) Grant*, 886 F.3d at 955. "In

doing so, we inquire whether the identified harmless errors, in the aggregate, 'had a

substantial and injurious effect or influence in determining the jury's verdict.'" *Id.*

(alterations omitted) (quoting *Brecht*, 507 U.S. at 637)). We include the following in our

cumulative error analysis: (1) the alleged prosecutorial misconduct—the remarks about

shaving;[25] and (2) the conceded *Booth* violation—the sentence recommendations.

Mr. Underwood has failed to show that the alleged prosecutorial misconduct and

the conceded *Booth* error, taken together, suffice to meet *Brecht*'s standard for showing

prejudice. As discussed above, the aggravating evidence presented in this case—

including the gruesome details of Mr. Underwood's plans and the actual murder as

described in his confession—was particularly strong, whereas the mitigating evidence

was not. And, although we have recognized that "harmless individual errors . . . may be

collectively more potent than the sum of their parts, "Mr. [Underwood] makes no

argument that the two errors that we have assumed here possess any particularized

---

[25] In our above discussion of the prosecutorial misconduct claim, we did not
determine whether the alleged error constituted actual error but instead concluded that
any potential error did not merit habeas relief because it did not rise to the level of a due
process violation. If the alleged prosecutorial misconduct constituted actual error, we
must include it in our cumulative error analysis. *Cargle v. Mullin*, 317 F.3d 1196, 1207
(10th Cir. 2003) ("[C]laims of prosecutorial misconduct . . . require a showing of
fundamental unfairness in order to provide habeas relief, unless they involve the violation
of specific constitutional rights . . . . [S]uch claims should be included in the cumulative-
error calculus if they have been individually denied for insufficient prejudice."). For
purposes of our cumulative error analysis, we assume without deciding that the alleged
prosecutorial misconduct constituted actual error and proceed accordingly.

synergies." *Id.* at 956 (quotations omitted). Mr. Underwood is therefore not entitled to habeas relief based on their cumulative effect on the jury's sentencing determination.

## III. **CONCLUSION**

We affirm the district court's denial of Mr. Underwood's § 2254 petition for writ of habeas corpus.